[Civ. No. 17148. First Dist., Div. Two. June 10, 1957.]

RALPH L. JENSEN, Respondent, v. WESTERN PIONEER INSURANCE COMPANY (a Corporation), Appellant.

RALPH L. JENSEN, Respondent, v. WESTERN PIONEER INVESTMENT COMPANY (a Corporation), Appellant.

Robert H. Kroninger and Lewis E. Lercara for Appellants.

Nichols, Richard, Williams, Morgan & Digardi for Respondent.

DOOLING, J. — Respondent brought separate actions against the two appellant companies for damages for the breach of a separate contract with each of them. The two cases were consolidated for trial and jury verdicts were returned in favor of the defendants. The court granted plaintiff's motion for new trial by an order which recited: ''The grounds upon which said new trial is granted include, but are not limited to, the ground of the insufficiency of the evidence to sustain the verdict.''

Respondent, in 1947, undertook to form an insurance company to write insurance for members of the Japanese race who were finding it difficult to secure insurance after the Second World War. This company, the appellant Western Pioneer Insurance Company, was incorporated and received a permit to do business in California in October of 1949. Initial sale of stock realized $330,000 and $30,000 par value of stock was issued to respondent for his services in promoting the corporation. The board of directors was expanded from three members to eleven, and respondent who had been president resigned as president and director, with the expressed

purpose of giving the new board complete freedom of action. The board, however, immediately reelected him to both positions.

Most of the stock was purchased by persons of Japanese ancestry and most of the directors and agents of the company were Japanese-Americans.

The appellant Western Pioneer Investment Company was incorporated later. It had a board of 15 directors and many of its directors were also directors of the appellant insurance company.

Each of the contracts sued upon made the respondent the general manager of the corporation which entered into it.

The contract with the insurance company was authorized by the board of directors, with respondent present at the meeting but not voting, in February 1953. This contract was approved at a stockholders' meeting on March 31, 1953.

The contract with the investment company was authorized September 18, 1953, by its board, respondent not voting. By identical letters of April 1, 1954, from each corporation respondent was discharged and notified that the respective contracts were rescinded.

The insurance company contract was for seven years and provided for a salary of $1,200 per month plus a sum equal to the amount that 5 per cent of the underwriting profit of the company exceeded the amount of salary for a year. Reasonable and necessary expenses incidental to his work were provided for, to be computed on a monthly basis. In addition to provisions for discretionary increases in salary, disability payments were also provided to an amount of $750 per month for the unexpired term of the contract. A death benefit of $400 per month to respondent's widow was provided on the same terms. Respondent had an irrevocable option to renew the contract for seven years. Respondent was to have "the general management, supervision and direction of the business affairs of Company." He was to appoint, employ, supervise, and discharge employees and agents; and prescribe duties, terms of employment, and compensation. In addition he was to serve as general business advisor to the board of directors and was to exercise other reasonable powers and perform other reasonable duties as prescribed by the board. All these powers and duties were expressly subject to the control of the board. Respondent agreed to devote his "*full* time and efforts . . . and to faithfully serve" the company.

The contract with the investment company contained the

same language as to authority and duties and provided for a salary of $300 monthly and an expense account. Respondent agreed to devote *substantial* time and diligence to this position.

■ The rules governing the review on appeal of an order granting a new trial on the grounds of insufficiency of the evidence are well settled and are clearly expressed in the following quotation from *Brooks* v. *Metropolitan Life Ins. Co.,* 27 Cal.2d 305, 307 [163 P.2d 689] :

"In passing upon a motion for a new trial based upon the insufficiency of the evidence, it is the exclusive province of the trial court to judge the credibility of the witnesses, determine the probative force of testimony, and weigh the evidence (*People* v. *Sarazzawski, ante,* [27 Cal.2d] p. 7 [161 P.2d 934] ; *Green* v. *Soule,* 145 Cal. 96, 102 [78 P. 337] ). ■ In considering the sufficiency of the evidence upon such motion the court may draw inferences opposed to those drawn at the trial (*Mercantile Trust Co.* v. *Sunset etc. Co.,* 176 Cal. 451, 456 [168 P. 1033] ), and where the only conflicts consist of inferences deduced from uncontradicted probative facts, the court may resolve such conflicts in determining whether the case should be retried (*Cauhape* v. *Security Savings Bank,* 118 Cal. 82, 84 [50 P. 310] ). ■ It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse the order of the trial court. (See *Dempsey* v. *Market Street Ry. Co.,* 23 Cal.2d 110, 113 [142 P.2d 929].) "

We approach the consideration of this appeal with these settled principles in mind. In their opening brief appellants state the following defenses which they assert were established without conflict in the evidence: "That a confidential relationship existed between the parties and that the contracts were not, as to the defendants, just and reasonable; that the contracts were secured by plaintiff in bad faith; that the consent of defendants to enter said contracts was obtained by undue influence exercised by plaintiff; that the consent of defendants was obtained by fraud; that the contracts and their consideration were illegal; that there was a failure of consideration; and that plaintiff breached the contracts in numerous specific material respects."

In their closing brief appellants single out three defenses which they say "were established at the trial as a matter of law and without contradiction." These are set out under the following headings: "A. Illegality of consideration for insurance company contract. B. Respondent committed mate-

rial breaches of his duty to appellant insurance company. C. A wilful breach of respondent's contract with defendant investment company was established as a matter of law."

The trial of the action took 23 days and the reporter's transcript is therefore voluminous, containing over 2,000 typewritten pages. ■ The burden is on appellants to establish that one or more defenses was, as they themselves put it, "established . . . as a matter of law and without contradiction."

■ The grounds of defense relied upon naturally fall into three classes: 1. fraud, duress and abuse of confidential relations in the inception of the contract; 2. illegality of consideration for the insurance company contract; and 3. wilful and substantial breaches in the performance of both contracts.

While appellants' presentation in their briefs does not always clearly segregate the discussion of the various grounds of defense it may be gathered that they attempt to find fraud, duress and abuse of a confidential relationship in the following factors summarized on pages 29-31 of appellants' opening brief: 1. The fact that at the inception of the insurance corporation respondent was at one time the sole director, appointed a second director and the two elected the third, which board determined to increase the membership of the board of directors to 11. 2. At the time the stock in the insurance company was sold the respondent solicited proxies and seven year proxies were secured from the holders of over 28,000 shares of stock out of approximately 30,000 shares sold. 3. Respondent named and controlled the proxy committees which voted this stock. 4. Respondent named the persons to become candidates for the expanded 11-member board and the proxy committees selected and dominated by respondent furnished the votes to elect such candidates. 5. It was this board of directors of the insurance company which authorized the contract here in suit and the votes of the proxy committee which ratified it at the stockholders' meeting. 6. This contract was unfair and unreasonable in its provisions, particularly in its provisions for disability payments to respondent and death payments to his wife, and in its length of term and option for seven year renewal. 7. Prior to the authorization of this contract the insurance company was operating at a loss and plaintiff at no time exhibited to the directors or shareholders the quarterly audits or other financial statements. 8. Respondent concealed his expense accounts, which included expenses for his wife and costs of pleasure trips and trips to

race tracks. To these may be added, as gleaned from other parts of the briefs, the further claims: 1. that the contracts were unfair because respondent had suffered a prior heart attack; 2. that respondent further dominated the boards of directors because he had secured the appointment of directors as agents of the companies and they feared incurring his displeasure; 3. that he falsely represented that he had suffered a $17,000 loss in promotional expenses for which he had received no reimbursement.

Owing to the fact that appellants in their briefs have cited testimony indiscriminately concerning both facts preceding the execution of the contracts and facts relied upon to show alleged breaches thereof, without clearly setting out any more definite specifications than those herein enumerated (and those only in the body of the brief in a continuous narrative fashion), it may be that appellants intended to urge other matters in this regard. If so we can only point to appellants' palpable failure to comply with rule 15(a) of the Rules on Appeal providing: "Each point in a brief shall appear separately under an appropriate heading . . . which [is] generally descriptive of the subject matter covered." The only heading referring to insufficiency of the evidence in appellants' opening brief reads: "The trial court abused its discretion in granting the motion for new trial on the ground of insufficiency of the evidence." Under this heading, which was too general in form to be of any assistance to this court, appellants gathered together material going to the inception of the contracts and material relied upon to show breaches thereof, without any clear demarcation and without any greater detail of specification than herein set out and all of the points here suggested except the three set out in the closing brief had to be gleaned from the body of the opening brief. An undue burden has thus been placed on this court which counsel for appellants could largely have avoided by a better organization of their opening brief and a clear specification of the separate grounds on which they relied.

As to the alleged domination of the directors and stockholders the defense evidence showed that the contracts were prepared by a Mr. Ericksen, who was the attorney for the corporations, without interference by respondent, that the amounts of salary, disability and death payments were not inserted therein until the directors had discussed them in the directors' meeting and arrived at the figures as a result of such discussion, and that respondent though present exerted

no pressure on the directors and abstained from voting thereon. The evidence further showed that in the only instance in which respondent attempted to discharge a director from a position with the insurance company the directors overrode respondent's action and retained the director in the same position at an increased salary. As to the proxies respondent testified that when they were obtained no pressure was exerted on the stockholders and it was explained to them that their proxies were revocable. The proxy committees were elected by the boards of directors. The Japanese members of the boards were all men of American education with experience in business affairs. The respondent had done the promotional work for the organization of the insurance company, had successfully brought it into being, and although he resigned as president and director when the new board of 11 met, they immediately reelected him to both positions. Thereafter as general manager he had directed the company through the lean years of a completely new insurance business to a point where in 1954 it showed such substantial profit (16.3%) that its total operation, including the previous years' losses, showed a 3 per cent profit.

The early steps in the organization of the insurance company several years before were no different than those of most corporations and the ultimate board of 11 directors had functioned through the period thereafter and the trial court certainly could draw the inference that they were not under respondent's domination when the contract of employment was entered into.

The alleged fraud consisted in 1. the representation that respondent had spent $17,000 in promotional activities for which he was never reimbursed although in fact he had received $30,000 in stock of the insurance company; 2. the concealment of the fact that respondent had taken vacation trips and trips to race tracks and charged them to his expense account without disclosing those facts; 3. that he had similarly charged expenses for his wife without disclosure; and 4. that he concealed audits and other financial statements which showed the insurance company operating at a loss.

Respondent testified as to these matters: 1. that he did not speak of his financial loss in promotional activities to any director in connection with his contract of employment; 2. that he charged to his expense account only business trips and the company was charged for no vacation trip or trip to any race track. 3. that because of advice not to drive great

distances his wife accompanied him on business trips to drive his automobile if necessary and further that his wife furnished services on such trips by meeting the wives of agents whom he was considering for employment and sizing up their home environment, that her expenses were only charged when she furnished such services, and that the fact that his wife accompanied him was known to the directors; 4. that adequate financial reports were made and discussed at all directors' meetings and the detailed audits and financial statements were always available to the directors if they wished to examine them. The evidence presented fact questions which all might reasonably be resolved in respondent's favor.

While the contract contained features quite generous to respondent, particularly in the disability provision and death benefits for the wife, in view of respondent's leading and important part in the formation and previous management of the insurance company, the fact that the contract was prepared by the company's attorney without dictation by respondent, and the fact that its features were fully discussed by the directors and the amounts inserted therein after and as a result of such discussion certainly supports the trial court's conclusion that there was no element of overreaching or abuse of confidence on respondent's part. His prior heart attack was well known to the directors, he had made a good recovery, and recent history has emphasized that a man may suffer a severe heart attack and make such a recovery as to be unimpaired for continued useful service. Those were matters known to the directors and the court could well draw the conclusion that they had the due consideration of the board.

The alleged wilful breaches consisted, in addition to the continuance of the claimed practice of making improper charges to his expense account sufficiently discussed above and visits to race tracks which he denied interfered with his proper performance of his duties, in his drawing advances for expenses which appellants argue were violations of the provision of section 1104, Insurance Code, prohibiting loans to "any officer, director, trustee or other person having authority in the management of its funds." Respondent testified that these advances never exceeded a succeeding two weeks estimated expenses and in view of the contract provisions for the payment of respondent's necessary expenses we cannot say that the trial court's conclusion that they were not loans within the meaning of the section referred to is unreasonable or not supported by the evidence.

The contract with the insurance company recited with other recitals in a preamble: ''WHEREAS, Manager . . . has performed valuable and excellent services in forming and promoting Company and in organizing and readying Company for business, at great personal sacrifice. . . .'' On cross-examination respondent was asked if his promotional services formed one of the considerations for the contract and gave an affirmative answer. The legal meaning of ''consideration'' was not explained to respondent and there is no evidence that he knew it. It is one reasonable conclusion that respondent understood consideration to mean something taken into consideration rather than consideration in the purely legal sense. He testified that he did not suggest the insertion of the quoted recital in the contract but that it was inserted therein on his own initiative by the company's attorney and, as previously noted, he testified specifically that his promotional losses were not mentioned to any director by him in any discussion leading up to the contract's authorization. The contract contains sufficient consideration in the mutual promises of the parties and it is not customary for careful attorneys to recite a consideration by way of recital in this form in the preamble of a contract. Rather the customary recital of legal consideration takes some such form as ''in consideration of.'' The trial court was not bound from respondent's testimony to conclude that these services were one of the legal considerations for the contract in view of all the circumstances. If the trial judge concluded, as he reasonably might, that they were not one of the legal considerations for the contract there could be no violation of section 840, Insurance Code, as claimed by appellants.

Appellant investment company cites the failure of respondent to attempt the negotiation of a loan from the Bank of Tokyo as directed by a resolution of its board adopted February 26, 1954. Respondent was formally discharged on April 1, 1954. Only the month of March intervened. Respondent testified that in the exercise of his judgment he felt that the negotiation of such a loan might disturb the company's loan arrangement with another bank on which it had an undrawn credit of $213,000. He testified that he wanted to discuss this matter further with the directors and if, after such discussion, they had still desired him to contact this bank he would have done so. The court could well conclude that respondent's delay in pursuing this matter did not constitute a wilful or any breach of his contract.

The fact that the insurance company's contract required the respondent's "full time" and the investment company's "substantial time" was well known to the directors of both companies, many of whom were on both boards. The offices of the two were together and on trips for one the respondent could well serve the other. Indeed the investment company was formed primarily to handle business incidental to that done by the insurance company. The action of the directors in approving both contracts and in permitting respondent to operate under both amounted to a practical construction that there was no inconsistency involved.

The case is the familiar one of substantial conflicts in the evidence and in the inferences reasonably to be drawn therefrom.

The order granting a new trial in both cases is affirmed.

Kaufman, P. J., and Stone, J. pro tem.* concurred.

A petition for a rehearing was denied July 10, 1957, and appellants' petition for a hearing by the Supreme Court was denied August 6, 1957.

*Assigned by Chairman of Judicial Council.